FULL FINAL STATEMENT OF CHARLES OWENS
In My Own Words
Chemical Exposure, Environmental Concerns, Unsafe Conditions, Retaliation, and Failure to Investigate

My name is Charles Owens, and I am making this statement based on everything I personally experienced, witnessed, documented, and reported while working as a security officer at the Georgia Pacific Brunswick Cellulose plant through Weiser Security.

I worked patrol security, and my duties included patrolling hazardous areas, escorting chemical truck drivers, checking vehicles and bags at Gate 2, monitoring restricted areas, and reporting serious safety hazards throughout the plant. I regularly patrolled the black liquor area, hydrogen sulfur circulation pump area, $ClO_2$ bleach plant, warehouses, docks, roadways, and environmental drainage areas.

Before my main chemical exposure incident happened, I had already been documenting ongoing unsafe conditions throughout the plant for months. I observed black liquor spills throughout roadway and drainage areas near the breakroom and main gate. I also observed strong rotten egg odors near the hydrogen sulfur circulation pumps and repeated alarms going off in both the $ClO_2$ bleach area and black liquor area.

Another major concern I documented involved the Transit AC asbestos pipes near Area 5 leading toward the river. These Transit AC asbestos pipes appeared cracked, crumbling, and spraying water and fibers onto the roadway and toward the river area for months.

I observed yellow-green slimy material and crumbling pieces coming from the Transit AC asbestos pipes multiple times. Based on what I personally witnessed, I became concerned that asbestos fibers and contaminated water from those damaged Transit AC asbestos pipes may have been entering into the paper mill process and possibly contaminating the pulp system.

I reported these concerns multiple times on my daily report sheets to my employer, but nothing changed for a long period of time.

Months later, I noticed the company wrapped the Transit AC asbestos pipes, which made me believe they already knew there was a serious issue. Later, those same Transit AC asbestos pipes sprayed large amounts of contaminated water again toward the mill area and roadway.

Because of these environmental and safety concerns, I documented flooding, drainage overflows, chemical spills, environmental contamination concerns, and unsafe conditions with photos, videos, recordings, and written reports from approximately March 2025 through February 12, 2026.

On January 26, 2026, around 10:26 PM, while patrolling near the black liquor and hydrogen sulfur circulation pump area, I observed fresh black liquor spills near the breakroom and roadway drainage areas. The rotten egg smell was extremely strong, and alarms were sounding loudly in both the bleach area and black liquor area.

As I continued through the area, the smell became stronger and stronger. I immediately started gagging and feeling like I was about to vomit. My throat felt tight, like something was hanging inside it, and I became dizzy and nauseous. I knew something was wrong.

Around 10:45 PM on January 26, 2026, I called my supervisor, Adam Young, on the company phone and reported the strong chemical smell, the alarms, and how sick I was feeling. Adam Young confirmed he smelled it too, and when I asked him the name of the area, he told me it was related to the hydrogen sulfur circulation pumps.

Around 10:58 PM, Adam Young later texted me confirming the area and incident. Even while sick, I continued trying to finish my shift and completed my written incident report.

While near the breakroom area by the patrol truck, I started vomiting while still on the phone with Adam Young. I told him that if I continued feeling sick, I was going to go to the emergency room. I also told him to make sure Michael Lachapelle knew about the alarms, chemical smell, and what happened. Adam Young told me he had already contacted him and would notify him again.

My shift ended around 6:00 AM on January 27, 2026, and I left my written incident report at Gate 2 in the normal location per company procedure.

Around 9:00 AM on January 27, 2026, I went to the emergency room because I still had trouble breathing, swallowing, nausea, vomiting, dizziness, and throat tightness.

After going to the hospital, I later returned to work that same night, but nobody from management contacted me, checked on me, or started any investigation into the incident, chemical spills, alarms, or my exposure.

On February 11, 2026, later that night going into midnight, dispatch called me to escort an Air Products chemical driver. At that time, Brunswick Cellulose had enforced a policy requiring all chemical trucks to go through the scales and be escorted, so I was following direct authority and site policy.

I have escorted thousands of vehicles and chemical trucks during my employment. On night shift alone, I sometimes escorted over 50 chemical trucks a week. Before working night shift, when I worked mornings and evenings, I sometimes escorted over 200 vehicles a week. Because of my experience, I know when something feels unusual or suspicious.

During the escort on February 11, 2026, I noticed the Air Products driver was driving approximately 5 miles per hour below speed, and I was monitoring my own speed also. I then noticed the driver suddenly stop.

I waited and observed approximately 12 seconds before exiting my patrol truck. I stopped about 50 feet behind him and approached the driver to make sure nothing was wrong and to make sure he was not attempting to turn off and go in another direction without escort.

That was part of my assigned duties. I was not harassing or threatening him.

When I approached the driver, I asked him for his ID and asked him what the problem was so I could document the situation. During the conversation, he stated he normally never had to go through this process and usually just drove through without escort. From my understanding, he did not like the escort policy.

I also recognized this driver as one of several chemical drivers who sometimes attempted to leave without calling dispatch or waiting for escort. Officers had dealt with this issue many times before, and both Brunswick Cellulose and my employer were aware this happened because officers had complained about it before.

I told the driver that if I caught him leaving without escort again, I would have to write him up and report it to my supervisor. That was all I said. I gave him only a verbal warning. He then asked me my name, and I told him my name was Charles Owens. I returned his ID and told him to have a good day.

After that, I escorted him approximately another five minutes to his chemical station. Based on my observations, I believed he may have wanted to turn off toward another area such as Warehouse 3 because I had seen

and told him I wanted to make a formal complaint, but he interrupted me and stated he did not have time to discuss it.

On February 27, 2026, I spoke with a Weiser HR representative named Miss Margaret. I explained I wanted to make a formal written complaint against Georgia Pacific and Michael Lachapelle. She told me she would send me an email so I could begin the complaint process, but I never received anything despite multiple follow-up calls.

On February 28, 2026, around 10:39 AM, Michael Lachapelle called me again. The phone call lasted approximately 17 minutes and 48 seconds. During that call, he stated that Georgia Pacific and Weiser believed I was trying to sue because of the chemical incident and stated that if chemicals were making me sick, maybe I did not need to work there.

I again explained the alarms, black liquor spills, strong rotten egg odors, and hydrogen sulfur circulation pump problems. I also explained those pumps had previously been wrapped with red tape and appeared faulty and leaking chemical odors and spills.

During the conversation, Michael Lachapelle repeatedly suggested maybe it was a virus instead of chemical exposure. He also stated that if what I was saying was true, I could lose my job with either company. I felt pressured and intimidated because I needed my job and had been working hard and long hours.

About ten minutes after that phone call, I arrived at the Georgia Pacific office with my hospital paperwork. While there, I noticed Terry Huge from Atlanta corporate walking back and forth outside the office window but never coming inside to speak with me.

During that meeting, Michael Lachapelle appeared nervous and repeatedly told me if I continued saying it was chemicals, I could lose my job. He also stated that if I ever wrote another chemical or incident report, I needed to come to him first before putting anything on paper.

I felt pressured to change my statement and say it was a virus instead of chemical exposure so the companies could protect themselves from liability.

After losing my position, I later attempted to apply for unemployment benefits. During that process, I was shocked when I was informed it was being reported that I had resigned and refused work, which was false. I never quit my job.

Thankfully, temporary unemployment benefits were eventually approved until I was able to obtain work through a temp service.

Because of everything that happened, I reported these issues to OSHA, EPA, Department ofLabor, Department of Justice, Attorney General consumer protection offices, OSHA whistleblower, EPA whistleblower, CDC, White House portals, Georgia representatives, Georgia Pacific corporate offices, Brunswick News, and other government agencies because I believe what happened involved retaliation, intimidation, unsafe working conditions, environmental hazards, pollution concerns, and abuse of power.

I believe the at-will employment system is being abused to silence workers and discourage people from reporting dangerous conditions. Workers should be protected when reporting unsafe conditions instead of fearing retaliation or losing their jobs.

This entire situation caused emotional stress, financial hardship, fear, and damage to my livelihood simply because I reported unsafe conditions and tried to do my job correctly.

drivers do that before near the black liquor area. I was simply making sure he stayed with escort because that was what we were instructed to enforce.

I never told him he was banned from the plant because that was not my authority, and I never told him to speed up. Those statements were false. Another important issue is that I never escorted that driver out of the plant. Dispatch normally would have called me if I was responsible for escorting him out. That should be investigated because I do not know who escorted him out or what happened afterward.

No one questioned me that night or the next day about this driver. The only person who later asked me about it was Captain Moody.

On February 12, 2026, around 3:04 PM, I spoke with Captain Moody for approximately six minutes. During that conversation, she asked if I could cover the 2:00 PM to 10:00 PM shift the next day, and I agreed. We also discussed the Air Products driver situation. I explained it was only a verbal warning and no major incident happened. Captain Moody told me to still document it because she already knew some drivers attempted to leave without escort.

Later that same night on February 12, 2026, I documented another chemical truck in the $ClO_2$ bleach plant area with chemical foam on the ground while chemicals were being unloaded.

Around 4:56 AM on February 12, 2026, I radioed supervisor Mrs. Grey and reported that black liquor was spraying into the air and onto the roadway near the hydrogen sulfur circulation pumps. The rotten egg smell was extremely strong, and black liquor was pouring onto the roadway where vehicles traveled.

Mrs. Grey contacted dispatch, and response personnel came out to inspect the area after my report. This incident was important because it showed there were continuing problems involving the hydrogen sulfur circulation pumps, ongoing spills, strong chemical odors, repeated alarm issues, and possible failures involving the monitoring and detection systems.

Based on what I witnessed over time, I believe the circulation pump system and monitoring system had serious operational problems that were not properly fixed.

I also believe this was one of the final reports that led to retaliation against me because shortly after continuing to report spills, alarms, environmental concerns, Transit AC asbestos pipe concerns, and safety hazards, I was removed from the site.

On February 13, 2026, before I was supposed to report for the 2:00 PM shift Captain Moody asked me to cover, Michael Lachapelle called me around 12:46 PM and told me I was no longer allowed on the Georgia Pacific property. He told me Steve Kirk did not want me on the site anymore because of my reports and the Air Products incident.

I asked Michael Lachapelle several times to send me something in writing explaining why I was being removed, but he never sent anything.

Around 1:11 PM on February 13, 2026, I texted him again requesting written confirmation, but he never responded.

On February 15, 2026, around 5:38 PM, I texted him again requesting a response and still received nothing back.

On February 16 and 17, 2026, I called Weiser HR several times and left voicemail messages but received no meaningful response.

On February 20, 2026, around 10:20 AM, I received a call from Michael Lachapelle's supervisor. I attempted to explain everything that happened

I believe there was never a proper investigation into my chemical exposure, environmental concerns, Transit AC asbestos pipe concerns, ongoing spills, alarm problems, or hazardous conditions I documented. Instead, I believe management focused more on protecting the companies and limiting liability than addressing the safety concerns I reported.
I also believe there needs to be accountability and stronger worker protections so situations like this do not continue happening to other workers. I call this the Genesis 1:26 Accountability principle, meaning people in positions of authority should protect others instead of abusing power and silencing workers.
Everything in this statement is true to the best of my knowledge and based on what I personally experienced, documented, and reported.

Charles Owens
912-255-1568



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Savannah Local Office**
7391 Hodgson Memorial Drive, Suite 200
Savannah, GA 31406
(912) 358-2810
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

### Issued On: 03/13/2026

To: Mr. Charles W. Owens
    2823 Springdale Road
    Brunswick, GA 31520
Charge No: 510-2026-05378

EEOC Representative and email:    Femalelei Fowler
        Investigator
        femalelei.fowler@eeoc.gov

---

## DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 510-2026-05378.

On behalf of the Commission,

Digitally Signed By: Jennifer Bessick
03/13/2026
Jennifer Bessick
Director

**U.S. Department of Labor**

Occupational Safety and Health Administration
Atlanta Regional Office
Sam Nunn Atlanta Federal Center
61 Forsyth Street, SW, Room 6T50
Atlanta, Georgia 30303



Your cooperation with this office is invited so that all facts of the case may be considered. We encourage the voluntary resolution of complaints where the parties seek it. The parties may settle the retaliation complaint at any point in the investigation either through OSHA's Alternative Dispute Resolution (ADR) program, with the assistance of the assigned investigator, or through their own negotiated settlement that OSHA approves. (See Attached Request for ADR and ADR Frequently Asked Questions.)

Sincerely,

Lily K. Colón
Assistant Regional Administrator
OSHA Atlanta Region
Whistleblower Protection Program